United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENIS MULLIGAN, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>IMPAX LABORATORIES, INC., *et al.*,<br><br>    Defendants.<br>_____/<br>HAVERHILL RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>IMPAX LABORATORIES, *et al.*,<br><br>    Defendants.<br>_____/ | No. C-13-1037 EMC<br><br>No. C-13-1566 EMC<br><br>**CONSOLIDATED CASES**<br><br>**ORDER (1) GRANTING PLAINTIFFS' MOTIONS TO CONSOLIDATE; (2) GRANTING BOILERMAKER'S MOTION FOR APPOINTMENT AS LEAD PLAINTIFF; AND (3) GRANTING BOILERMAKER'S MOTION FOR APPROVAL OF CLASS COUNSEL**<br><br>**(Docket Nos. 16, 18-19)** |

## I. INTRODUCTION

This is a securities class action brought on behalf of all persons who purchased or otherwise acquired the common stock of Impax Laboratories, Inc. during a 2011-2013 class period.[1] Currently pending before the court are three competing motions brought by three would-be lead plaintiffs: Boilermaker Blacksmith National Pension Trust ("Boilermaker"), Pontiac General ("Pontiac"), and

---

[1] The two cases that are the subject of the instant motion to consolidate have different class periods. *Mulligan v. Impax Laboratories, Inc., et al.*, C-13-1037 EMC alleges a lass period of June 6, 2011 through March 4, 2013, and *Haverhill Retirement System v. Impax Laboratories, Inc., et al.*, C-13-1566-EMC alleges a class period of February 25, 2011 through March 4, 2013.

Government of Bermuda Contributory and Public Service Superannuation Pension Plans ("Bermuda"). Each motion seeks the consolidation of two actions – *Mulligan v. Impax Laboratories, Inc., et al.*, C-13-1037 EMC and *Haverhill Retirement System v. Impax Laboratories, Inc., et al.*, C-13-1566-EMC – both of which bring claims against Defendants under § 10(b) and § 20(a) of the Securities Exchange Act of 1934. Additionally, each movant seeks to be appointed as lead plaintiff, and seeks approval of its selected counsel. After the filing of three motions, Pontiac filed a notice of non-opposition, conceding that it does not have the largest financial interest in this case.

## II. FACTUAL & PROCEDURAL BACKGROUND

The two actions that are the subject of the pending motion to consolidate both allege violations of the Securities Exchange Act of 1934 by Impax Laboratories, Inc., and three of Impax's officers (collectively, "Defendants"). Impax is a specialty pharmaceutical company that develops, manufactures, and markets both generic and branded drugs. Compl. ¶ 14.[2] Plaintiffs allege that Defendants made various false statements and failed to disclose various adverse facts about Impax, thereby deceiving the investing public about Impax's prospects and business, artificially inflating the price of Impax common stock, and inducing members of the putative class to purchase Impax common stock at inflated prices. Compl. ¶ 20.

These alleged false statements and omissions relate to FDA inspections and adverse findings regarding compliance with applicable manufacturing regulations at Impax's manufacturing facility in Hayward, California. Compl. ¶¶ 23-24. The Hayward facility is one of Impax's two manufacturing sites, and it is the one at which the majority of Impax's research and development activities take place. Compl. ¶ 23. On May 31, 2011, Impax received a warning letter from the FDA regarding the Hayward facility, citing various deviations from regulations governing manufacturing processes, stability testing, record keeping, and quality standards for the manufacture of human pharmaceuticals. Compl. ¶ 24. The FDA conducted a re-investigation of the Hayward

---

[2] All citations are to the complaint in *Mulligan v. Impax Laboratories, Inc., et al.*, C-13-1037 EMC, as that is the lower numbered case. The complaint in *Haverhill Retirement System v. Impax Laboratories, Inc., et al.*, C-13-1566-EMC contains substantially similar allegations.

facility in the first quarter of 2012, and issued a "Notice of Inspectional Observations" detailing deficiencies in the company's quality system. Compl. ¶ 25. At this time, the FDA indicated that a satisfactory re-inspection of the Hayward facility would be necessary to close out the issues raised in the May 2011 warning letter. *Id.*

Despite these troubles, Impax made various statements throughout 2011, 2012, and the first two months of 2013 indicating that the FDA's concerns were being addressed, and that it did not expect the regulatory violations, or the steps being taken to remedy the violations, to have a substantial negative impact on its manufacturing, research, or development operations. Compl. ¶¶ 26-48. On March 4, 2013, however, Impax announced that the FDA had completed another inspection of the Hayward facility, and found twelve "observations," or problems, at the facility, three of which were repeat violations that had not been corrected after the earlier inspections. Compl. ¶ 49. As a result of its failure to comply with these regulations, Impax indicated that it was now expecting significant delays in launching launch several key drugs in the company's line of products. *Id.* Also on this date, Impax filed a Form 8-K with the SEC providing a redacted version of the FDA's notice. Compl. ¶ 50.

As a result of this news, Impax's stock dropped $5.20 per share to close at $14.80 per share on March 5, 2013, a one day decline of 26% on high volume. Compl. ¶ 51. The stock experienced a large volume of sales, and a 45% decline in value from its class period high. Compl. ¶ 53. Plaintiffs allege that Defendants were aware that their optimistic statements prior to the March 4, 2013 disclosure were false and misleading, and that these false and misleading statements artificially inflated stock prices during the class period. Compl. ¶¶ 52-54. Plaintiffs thus allege that Defendants' false and misleading statements operated as a fraud or deceit on purchasers of Impax common stock during the class period by misrepresenting Impax's business and prospects. Compl. ¶ 54. As a result of this fraud, members of the putative class have suffered economic loss. *Id.*

The two actions that are the subject of the motion to consolidate were filed on March 7, 2013 (*Mulligan v. Impax*) and April 8, 2013 (*Haverhill Retirement System v. Impax*), respectively. *Mulligan* alleges a putative class of all persons who purchased or otherwise acquired Impax common stock between June 6, 2011 and March 4, 2013, inclusive. *Haverhill* alleges a putative

3

class of all persons who purchased or otherwise acquired the publically-traded common stock of Impax between February 25, 2011 and March 4, 2013, inclusive. Both bring causes of action under § 10(b) and § 20(a) of the Securities and Exchange Act of 1934. This Court issued an order relating the two actions on April 19, 2013. Docket No. 11.

As required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs in *Mulligan* published a notice "in a widely circulated national business-oriented publication or wire service" announcing the litigation, and stating that any member of the putative class could move the court to be appointed lead plaintiff within 60 days. Docket No. 17-1 (publication of press release in *Business Wire*); 15 U.S.C. § 78u-4(a)(3)(A)(I).[3] In response to the notice, three parties have filed motions seeking appointment as lead plaintiff: Boilermaker Blacksmith National Pension Trust ("Boilermaker"), Pontiac General ("Pontiac"), and Government of Bermuda Contributory and Public Service Superannuation Pension Plans ("Bermuda"). All three movants owned considerable amounts of Impax common stock during the class period. On March 20, 2013, Pontiac filed a notice of non-opposition to the other motions for appointment of lead plaintiff, conceding that it did not have the greatest financial interest in the case. Docket No. 33.

### III. DISCUSSION

A. Motion to Consolidate

All three motions currently pending before the Court seek to consolidate *Mulligan v. Impax Laboratories, Inc., et al.*, C-13-1037 EMC and *Haverhill Retirement System v. Impax Laboratories, Inc., et al.*, C-13-1566-EMC. No opposition to the motions to consolidate has been filed.

Where more than one action "on behalf of a class asserting substantially the same claim or claims arising under" the PSLRA has been filed, and any party has moved to consolidate those actions, the motion to consolidate must be decided prior to appointment of a lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(ii). Under Rule 42(a) of the Federal Rules of Civil Procedure, a court may consolidate two or more actions that "involve a common question of law or fact." Fed. R. Civ. P.

---

[3] Under the PSLRA, when there are multiple class actions asserting substantially the same claim or claims, only the plaintiffs in the first filed action need publish such notice. 15 U.S.C. § 78u-4(a)(3)(A)(ii).

4

42(a). Here, *Mulligan* and *Haverhill* bring claims against the same defendants, under the same sections of the Securities and Exchange Act of 1934, based on substantially identical allegations of fraudulent or misleading statements that artificially inflated Impax's stock price for the relevant class period. Though the class periods in the two actions have different start dates – February 25, 2011 for *Haverhill* and June 6, 2011 for *Mulligan* – both class periods end on March 4, 2013, and both putative classes involve all persons who purchased or otherwise acquired Impax's common stock during the relevant class period. These cases thus present questions of law and fact that overlap almost completely.

As these actions "assert substantially the same claim" under the PSLRA and also "involve a common question of law or fact," this Court finds that they should be consolidated.

B. <u>Motion for Appointment as Lead Plaintiff</u>

Under the PSLRA, courts considering motions for appointment as lead plaintiff "shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that –

>   (aa)  has either filed the complaint or made a motion in response to a notice under subparagraph (A)(I);
>
>   (bb)  in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
>   (cc)  otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

The Ninth Circuit has recognized that district courts deciding motions for appointment as lead plaintiff under this provision should follow a three-step process. *In re Cavanaugh*, 306 F.3d 726, 729-30 (9th Cir. 2002). First, the court must determine whether the PSLRA's requirement of notice to the class has been satisfied. *Id.* at 729.

In the second step, the court must consider the financial interest of the potential plaintiffs, as the potential plaintiff with the greatest financial interest is presumptively the most adequate plaintiff. *Cavanaugh*, 306 F.3d at 729-30. Finally, in the last step, the court must give the other potential plaintiffs the chance to rebut the presumptive lead plaintiff's showing that it satisfies the typicality

and adequacy requirements of Rule 23(a). *Id.* at 730. Only if they are successful in this does the court turn to the plaintiff with the next greatest financial interest and determine whether they meet the Rule 23(a) requirements. *Id.*

### 1. Notice Requirement

Here, as required by the statute, the lead plaintiff in the first filed action published a notice "in a widely circulated national business-oriented publication or wire service" announcing the litigation and the 60 day deadline for the filing of motions for appointment of lead plaintiff. Docket No. 17-1 (publication of press release in *Business Wire*); 15 U.S.C. § 78u-4(a)(3)(A)(I). All three movants here filed motions in response to this notice. This requirement is thus met.

### 2. Financial Interest of Potential Plaintiffs

The question of which potential plaintiff has the greatest financial interest in this matter is the key dispute on this motion. Though Pontiac has conceded that it does not have the greatest financial interest, Boilermaker and Bermuda sharply contest which of them has the greatest interest in the relief sought by the class. The two parties present evidence about the aggregate losses they suffered during the class period, the total and net funds they expended on purchasing Impax stock, the total and net shares purchased during the class period, and the number of shares retained at the end of the class period. They dispute which of these factors weighs most heavily in determining which party has the largest financial interest in the class, but do not appear to dispute which of them has the greater interest on any given metric. The parties submit the following information (bold indicates the highest number in each category):

///
///
///
///
///
///
///
///

| Movant | Boilermaker (*Mulligan* class period)[4] | Boilermaker (*Haverhill* class period) | Bermuda (*Haverhill* class period) |
|---|---|---|---|
| Class Period Loss | **$502,360.62 (FIFO)** **$486,299.27 (LIFO)**[5] | $428,088.73 | $176,823.58 |
| Total Funds Expended | $2,341,064.58 | **$3,978,036.87** | $1,826,957.95 |
| Net Funds Expended | $68,124.99 | Not provided[6] | **$1,205,463.77** |
| Total Shares Purchased | 102,897 | **177,880** | 90,042 |
| Net Shares Purchased | 2,819 | **77,075** | 63,200 |
| Shares Retained | **77,075** | 77,075 | 63,200 |
| Losses Calculated from Retained Shares[7] | **$629,309.67** | $629,309.67 | $221,920.10 |

The Ninth Circuit has not provided clear guidance on which metrics district courts should use in determining which potential lead plaintiff has the largest financial interest in a case, noting only that "the court may select accounting methods that are both rational and consistently applied." *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002). Courts in this district and elsewhere have used a variety of methods to estimate the financial interest of potential plaintiffs. *See Perlmutter v. Intuitive Surgical, Inc.*, 10-CV-03451-LHK, 2011 WL 566814 (N.D. Cal. Feb. 15, 2011) (describing different approaches).

---

[4] As discussed below, it appears that the *Haverhill* class period, which is longer, is the proper one to use in calculating the potential plaintiffs' financial interest. As Boilermaker only submitted calculations based on the *Mulligan* class period with its initial motion, however, Bermuda challenges whether this Court should consider Bermuda's calculations based on the *Haverhill* class period. As discussed below, courts generally disregard supplemental information presented by potential plaintiffs after they have filed their initial motion where such information would give them a greater financial interest than would the information submitted with the original motion.

[5] Separate First In/First Out (FIFO) and Last In/First Out (LIFO) calculations were provided only for Boilermaker's loss under the *Mulligan* class period.

[6] The data Boilermaker provided does not list this number for the *Haverhill* class period.

[7] Though the parties did not initially submit information on their losses as calculated using the retained shares method articulated in *Eichenholtz v. Verifone Holdings, Inc.*, C07-06140MHP, 2008 WL 3925289 (N.D. Cal. Aug. 22, 2008), discussed further below, they submitted supplemental filings with this information at this Court's request. Docket Nos. 46-47.

7

Boilermaker points to a number of cases that looked to total losses in determining which potential plaintiff had the greatest financial interest in a case. *In re Zynga, Inc. Secs. Litig.*, No. C 12-04007 JSW, 2013 U.S. Dist. LEXIS 9314, at *5-6 (N.D. Cal. Jan. 23, 2013); *Johnson v. OCZ Tech. Group*, No. CV 12-05265 RS, 2013 U.S. Dist. LEXIS 1610, at *6-7 (N.D. Cal. Jan. 4, 2013) (appointing as lead plaintiff party with the greatest loss, and noting that "[n]o plaintiff challenges this calculation"); *Bruce v. Suntech Power Holdings Co., Ltd.*, No. CV 12-04061 RS, 2012 U.S. Dist. LEXIS 167702, at *6-7 (N.D. Cal. Nov. 13, 2012) (all potential lead plaintiffs provided information on their financial interest in the form of their losses); *Feyko v. Yuhe Int'l Inc.*, Case No. CV 11-05511 DDP (PJWx), 2012 U.S. Dist. LEXIS 28040, at *5-6 (C.D. Cal. Mar. 2, 2012) (same); *Russo v. Finisar Corp.*, CASE NO. 5:CV 11-01252-EJD, 2011 U.S. Dist. LEXIS 124593, at *10-11 (N.D. Cal. Oct. 27, 2011) (same); *Andrade v. Am. Apparel, Inc.*, CASE NO. 10-06352 MMM (PJWx), 2011 U.S. Dist. LEXIS 79795 (C.D. Cal. Mar. 15, 2011) (same); *Niederklein v. PCS Edventures!, com, Inc.*, Case No. 1:10-cv-00479-EJL-CWD, 2011 U.S. Dist. LEXIS 18247, at *11-12 (D. Idaho Feb. 24, 2011) (same). The vast majority of these cases, however, simply recite the losses the various potential plaintiffs incurred with no detailed discussion of the calculations behind these losses, or consideration of other potential metrics for determining the greatest financial interest in a case.

Other cases point out that under the 2005 Supreme Court case *Dura Pharmaceuticals, Inc. v. Broudo*, not all losses incurred during a class period will be compensable. *See, e.g.*, *Perlmutter*, 2011 WL 566814, at *4 (discussing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)). In *Dura*, the Court held that private securities fraud actions were permitted "where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.* at 346. Thus, a plaintiff alleging only that she had sustained losses during the class period has not adequately stated a claim unless she alleges that the defendant's fraud *caused* her loss. *Id.* Where a plaintiff sustained losses during a class period, but these losses stem from stocks sold before the alleged fraud was revealed, these losses would generally not be traceable to the fraud, but instead to ordinary market forces. The Court noted that private securities fraud actions are intended "not to

8

1 provide investors with broad insurance against market losses, but to protect them against those
2 economic losses that misrepresentations actually cause." *Id.* at 345.
3     Courts in this district attempting to calculate financial interest using means other than loss
4 experienced during the class period have looked to different metrics to make such determinations.
5 *See Perlmutter v. Intuitive Surgical, Inc.*, 10-CV-03451-LHK, 2011 WL 566814 (N.D. Cal. Feb. 15,
6 2011) (describing different approaches). For example, the court in *Eichenholtz v. Verifone
7 Holdings, Inc.*, determined financial interest based on shares purchased during the class period that
8 were retained as of the last day of the class period. C07-06140MHP, 2008 WL 3925289, at *2 (N.D.
9 Cal. Aug. 22, 2008). The court then took the price of the shares immediately before the close of the
10 class period, and calculated loss based on the following formula:

> if a share was not sold within 90 days subsequent to December 3,
> 2007, the loss is to be measured using an average of the daily closing
> price of Verifone stock during the 90–day period beginning December
> 3, 2007. If a share was sold within 90 days subsequent to December
> 3, 2007, the loss is to be measured using the higher of the actual sale
> price or an average of the daily closing price from December 3, 2007
> to the date of sale.

15 *Id. See also Schueneman v. Arena Pharmaceuticals, Inc.*, 10CV2335 BTM BLM, 2011 WL
16 3475380 (S.D. Cal. Aug. 8, 2011) (adopting retained shares method of calculating financial interest);
17 *Applestein v. Medivation Inc*, C 10-00998 MHP, 2010 WL 3749406 (N.D. Cal. Sept. 20, 2010)
18 (same).
19     The court in *In re Network Associates, Inc., Sec. Litig.*, on the other hand, based its
20 calculations not on shares retained, but on net shares purchased, subtracting the number of shares
21 sold during the class period from the number of shares purchased. 76 F. Supp. 2d 1017, 1027 (N.D.
22 Cal. 1999). The court found that "[a]t least as a first approximation, the candidate with the most net
23 shares purchased will normally have the largest potential damage recovery," but acknowledged that
24 this approach would be less accurate in situations where "the amount of the "fraud premium" varied
25 over the course of the class period." *Id.*; *see also In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp.
26 2d 1102, 1108 (N.D. Cal. 2001) (basing calculations on net shares, and supplementing with
27 calculations of losses suffered by selling shares during the class period). The court in *Perlmutter* did
28 not ultimately determine one correct method of calculating financial interest, but compared the

parties' interests based on both the retained shares method articulated in *Eichenholtz* and approximate losses suffered during the class period. 2011 WL 566814, at *3-12 (ultimately finding that the same potential plaintiff had the greatest financial interest under both methods).

Even after *Dura*, however, some courts continue to calculate financial interest based primarily on approximate losses suffered. In *Richardson v. TVIA, Inc*., the court looked to four factors to determine which potential plaintiff had the largest financial interest. C 06 06304 RMW, 2007 WL 1129344, at *3 (N.D. Cal. Apr. 16, 2007). These factors are:

(1)  the number of shares purchased during the class period;
(2)  the number of net shares purchased during the class period;
(3)  the total net funds expended during the class period; and
(4)  the approximate losses suffered.

*Id.* The court noted that courts using these factors "consider the fourth factor, the approximate losses suffered, as most determinative in identifying the plaintiff with the largest financial loss." *Id.* at *4.

Boilermaker argues that looking only to shares retained at the end of the class period fails to accurately capture all losses because shareholders could have experienced losses in connection with partial corrective disclosures during the class period. Docket No. 37 at 8-9. Courts in this district have recognized that calculations based on retained shares are not appropriate in cases where multiple partial corrective disclosures are alleged over time. *Nicolow v. Hewlett Packard Co.*, 12-05980 CRB, 2013 WL 792642, at *4 n.5 (N.D. Cal. Mar. 4, 2013) (citing cases). The court in *Nicolow* found that

> Whether or not . . .a retained shares calculation may be preferable to a [last in/first out loss] calculation in some cases, this is not such a case. The allegations here involve multiple partial corrective disclosures by HP during the class period. As many district courts have observed, net shares purchased and a "retained shares" calculation are less useful analytical tools where gradual disclosures are involved, because those methods assume a constant "fraud premium" throughout the class period.

*Id.* at *4 (internal citations omitted). Bermuda argues that *Nicolow* is inapposite because no partial corrective disclosures have been plead in this case. Docket No. 39 at 2. This, however, is not

entirely accurate. Though the complaints in *Mulligan* and *Haverhill* do not use the phrase "partial corrective disclosure," or list the smaller drops in stock prices during the class period that Boilermaker identifies in its reply, both complaints identify disclosures that Defendants made prior to March 4, 2013 about ongoing problems with FDA inspections. *Mulligan* Compl. ¶¶ 33, 36; *Haverhill* Compl. ¶¶ 47, 51.[8]

Considering the submissions of the parties and the various calculations methodologies used by different courts, this Court finds that the retained shares method articulated in *Eichenholtz* most closely approximates the financial interest of the potential plaintiffs in this suit. Though at this early stage of the litigation all methods for estimating financial lost will involve some level of guesswork, the *Eichenholtz* method has the advantage of looking to losses experienced due to the shares that the plaintiff was holding at the time the fraud was disclosed, and thus focusing on losses caused when stock purchased at artificially inflated prices decreases in value due to the disclosure of the fraud. This metric therefore excludes losses caused by normal market fluctuations prior and related to the disclosure of the fraud. Under the retained shares methodology, Boilermaker clearly has the larger financial interest: $629,309.67 compared to Bermuda's $221,920.10.

Even if this Court were to consider total losses sustained during the class period, however, Boilermaker would still prevail, as it has losses of over $425,000, while Bermuda has losses of just $176,823.58. *See Richardson*, 2007 WL 1129344, at *3 (finding that approximate losses suffered were best indicator of financial interest); *Nicolow*, 2013 WL 792642, at *4 (finding that net shares and retained shares methods were less accurate where there were partial corrective disclosures throughout the class period).

Bermuda argues strenuously that net shares is the more appropriate metric. The difference between net shares (the total number of shares purchased during a class period minus total number

---

[8] On the other hand, the Ninth Circuit has held that in order to properly plead causation under *Dura*, "the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). Under this standard, the two complaints here do not adequately plead a cause of action as to the pre-March 4, 2013 partial disclosures, because they do not contain allegations that the market responded to these disclosures in a way that caused losses to the putative class members.

of shares sold) and retained shares (the total number of shares purchased during the class period still held at the end of the class period) is a critical one in this case. This is because Boilermaker began the class period with a large number of shares, sold them all during the class period, and then purchased a number of shares, a large number of which it still held at the end of the class period. Docket No. 17-2. Thus, looking to net shares for the *Mulligan* class period makes Boilermaker appear to have a much smaller financial interest than does Bermuda, which does not appear to have held any shares at the beginning of the class period (although their submissions are not entirely clear on this front). In contrast, looking to shares purchased at the inflated price (i.e. during the class period) that the party was holding on the day the fraud was disclosed, Boilermaker clearly has the larger financial interest.

Bermuda argues that net shares is a better indicator of financial interest than the retained shares method because Boilermaker benefitted from the fraud when it sold shares at an inflated price early in the class period, and that this benefit offsets any loss associated with shares purchased during the class period and held as of the date the fraud was revealed. This assumption that benefit from sales early in the class period offsets losses associated with shares purchased later in the class period only holds, however, if one assumes a relatively constant "fraud premium" throughout the class period. *See Nicolow*, 2013 WL 792642, at *4 (looking to LIFO loss estimate rather than net shares method where multiple partial disclosures varied "fraud premium" throughout the class period); *In re Network Associates, Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999) (acknowledging that the net shares approach is less accurate in situations where "the amount of the "fraud premium" varied over the course of the class period"); *Perlmutter*, 2011 WL 566814, at *6 (considering net shares and retained shares methods, and concluding that "looking exclusively to the number of shares purchased during the class period that are also retained at the end of the class period is likely the most accurate reflection of a plaintiff's potential damages"). At this stage in the proceedings, the question of whether the fraud premium was constant enough throughout the class period for benefits from early sales to offset losses from shares bought later in the class period is speculative. The Court thus finds that the *Eichenholtz* retained shares method is a more accurate

1  estimate of the potential plaintiff's financial interest than simply looking at the number of net shares
2  purchased during the class period.

3      Boilermaker has the largest financial interest under both the *Eichenholtz* retained shares
4  method, and total estimated losses. As this Court determines that these are both more accurate
5  estimates of financial interest than net shares, the Court concludes that Boilermaker has a larger
6  financial interest in this matter than Bermuda, thus making it the presumptively most adequate lead
7  plaintiff.

8      3.    <u>Boilermaker's Supplemental Disclosures and Calculations</u>

9      Bermuda argues that Boilermaker should be disqualified as a potential lead plaintiff because
10  initial motion Boilermaker failed to submit information about all relevant transactions with its initial
11  motion, as is required by the PSLRA. Docket No. 39 at 3-9. The PSLRA requires that any party
12  wishing to serve as lead plaintiff must serve their motion within 60 days after the notice of the action
13  is published. 15 U.S.C. § 78u–4(a)(3)(A)(I). The statute also requires that each potential plaintiff
14  must file with the court a sworn certification, that *inter alia*, "sets forth all of the transactions of the
15  plaintiff in the security that is the subject of the complaint during the class period specified in the
16  complaint." 15 U.S.C. § 78u-4(a)(2)(A)(iv). Courts have held that this precludes consideration of
17  any financial loss asserted for the first time after the initial motion. *See In re Telxon Corp. Sec.*
18  *Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999) ("All motions for lead plaintiff must be filed
19  within sixty (60) days of the published notice for the first-filed action. The plain language of the
20  statute precludes consideration of a financial loss asserted for the first time in a complaint, or any
21  other pleading, for that matter, filed after the sixty (60) day window has closed."); *Zhu v. UCBH*
22  *Holdings, Inc.*, 682 F. Supp. 2d 1049, 1053 (N.D. Cal. 2010) (citing Telxon and noting that "[t]he
23  intent of the provisions is to ensure that the lead plaintiff is appointed at the earliest possible time
24  and to expedite the lead plaintiff process.")

25      Bermuda's objection is based on the fact that in its motion, Boilermaker submitted to the
26  court calculations based on the shorter class period articulated in *Mulligan* rather than the longer
27  class period articulated in *Haverhill*. Docket No. 17-2. Boilermaker filed calculations based on the
28  longer class period in *Haverhill* with its reply. Docket No. 36-1. One court in this district has held

that calculating the financial interest of potential plaintiffs, it is proper to look to the longest class period among the cases to be consolidated. *Eichenholtz*, 2008 WL 3925289, at *2; *but see Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 624-25 (E.D. Wis. 2009) ("rather than ruling on the proper class period, courts usually (*but not always*) use the most inclusive class period and select as lead plaintiff the movant with the largest financial interest under that period") (emphasis added) (internal citations omitted).

Bermuda cites to a number of cases in support of its argument that Boilermaker should be prevented from serving as lead plaintiff because it failed to submit information for the longer class period with its initial motion. These cases, however, are all distinguishable. For example, in *Carson v. Clarent Corp.*, the court declined to consider a late filed motion to be appointed lead plaintiff. No. C 01-03361 CRB, 2001 U.S. Dist. LEXIS 22059, at *6-7 (N.D. Cal. Dec. 14, 2001). Here, Bermuda does not challenge that Boilermaker's initial motion was timely.

The other cases that Bermuda cites do not actually find that the potential plaintiff is disqualified from serving based on late-filed information, but hold only that the court will not consider late-filed information that would increase the plaintiff's financial interest beyond what was represented in the initial motion. *See, e.g.*, *Miller v. Leapfrog Enterprises, Inc.*, C03-5421 RMW (Docket No. 39-2); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 819 (N.D. Ohio 1999) (declining to consider late-filed amended complaint because "[t]he plain language of the statute precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed after the sixty (60) day window has closed."); *Darwin v. Taylor*, No. 12-cv-01038-CMA-CBS, 2012 U.S. Dist. LEXIS 152838 (D. Colo. Oct. 23, 2012) ("the Court [is not] aware of, any cases in which a lead plaintiff has been appointed based on trading information and corresponding losses introduced for the first time after the PSLRA's 60-day deadline expired"). In this case, the information Boilermaker submitted with its response actually indicated lower financial interest by some metrics, but higher by others. *Compare* Docket No. 17-2 *with* Docket No.

36-1.[9] For the two metrics that the Court finds the most accurate reflection of the potential plaintiffs' financial interest, however, Boilermaker has the greater financial interest regardless of which class period is used. As the late-filed information does not change the result on this motion, the Court need not reach the question of whether it can properly consider this information.

4. Rule 23(a) Requirements

Turning to the third step in the process articulated in *Cavanaugh*, it is clear that Boilermaker has met the Rule 23(a) requirements of adequacy and typicality. *Cavanaugh*, 306 F.3d at 730-31. As an entity that acquired Impax common stock during the class period, Boilermaker has claims that are representative of the putative class, and there is no indication that it will not fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Other than Bermuda's argument that Boilermaker should be disqualified for failing to submit certain calculations with its initial motion – which the Court rejects for the reasons discussed above – no party has challenged Boilermaker's the adequacy or typicality under Rule 23(a). The Court finds that Boilermaker meets these requirements.

C. Motion for Approval of Selection of Class Counsel

Once the court rules on the motion to appoint lead plaintiff, it must rule on the motion for approval of class counsel. While the PSLRA requires the court to confirm the plaintiff's choice of counsel, it also "clearly leaves the choice of class counsel in the hands of the lead plaintiff." *Cavanaugh*, 306 F.3d at 734. Thus, "if the lead plaintiff has made a reasonable choice of counsel, the district court should generally defer to that choice." *Cohen v. U.S. Dist. Court for N. Dist. of California*, 586 F.3d 703, 712 (9th Cir. 2009).

Boilermaker has selected Cohen, Milstein, Sellers & Toll, PLLC as class counsel. The firm has extensive experience in securities class action cases. Docket No. 17-3 (firm resume). Other courts in this district have approved the appointment of Cohen Milstein in cases arising under the Securities and Exchange Act and governed by the PSLRA. *See Bruce v. Suntech Power Holdings*

---

[9] Bermuda also challenges Boilermaker's newly filed information in that it is not accompanied by the appropriate certification by the plaintiff, as required under the PSLRA. 15 U.S.C. § 78u-4(a)(2)(A)(iv).

1  *Co. Ltd.*, CV 12-04061 RS, 2012 WL 5927985, at *3 (N.D. Cal. Nov. 13, 2012). Boilermaker has
2  also retained the law firm of Gold, Bennett, Cera & Sidener, LLP as liaison counsel for the class.
3  Gold Bennett similarly has extensive experience in securities class action. *See In re Rubber*
4  *Chemicals Antitrust Litig.*, 232 F.R.D. 346, 355 (N.D. Cal. 2005) (finding that "it is undisputed that
5  the counsel selected by the named plaintiffs-Gold Bennett and Cohen Milstein-have extensive
6  experience and expertise in antitrust and other class actions, as well as other complex litigation, and
7  have successfully prosecuted such cases in courts across the country" and approving both firms as
8  class counsel in price fixing class action). This Court finds Boilermaker's selection of counsel
9  reasonable, and thus grants its motion to approve class counsel.

## IV. CONCLUSION

For the forgoing reasons, the motions to consolidate *Mulligan v. Impax Laboratories, Inc., et al.*, C-13-1037 EMC and *Haverhill Retirement System v. Impax Laboratories, Inc., et al.*, C-13-1566-EMC is **GRANTED**. Movant Boilermaker's motion for appointment as lead plaintiff is **GRANTED**; the other motions for appointment as lead plaintiff are **DENIED**. Boilermaker's motion for approval of class counsel is **GRANTED**.

This order disposes of Docket Nos. 16, 18, and 19.

IT IS SO ORDERED.

Dated: July 2, 2013

_____
EDWARD M. CHEN
United States District Judge